# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **BRANDON MCCROSKEY, et al.,** | **:** | **CASE NO. C-1-01-429** |
| | **:** | |
| **Plaintiffs,** | **:** | **Judge Spiegel** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **BUTLER COUNTY SHERIFF'S** | **:** | |
| **OFFICE,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |
| | **:** | |

---

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

---

Respectfully submitted,

MEZIBOV & JENKINS, LLP


   /s/ Marc D. Mezibov
MARC D. MEZIBOV (Ohio Bar No. 0019316)
CHRISTIAN A. JENKINS (Ohio Bar No. 0070674)
SUSAN E. BRABENEC (Ohio Bar No. 0075200)
1726 Young Street
Cincinnati, Ohio 45202
Telephone (513) 723-1600
Telecopier (513) 723-1620

Counsel for Plaintiffs

## COMBINED TABLE OF CONTENTS AND SUMMARY

I.     INTRODUCTION …………………………………………………………...…1

II.     STATEMENT OF FACTS………………………………………………………1

     A.     The Butler County Sheriff's Office Explorers Program…………………………..1

     B.     Plaintiffs join BCSO's Explorers Post and are
            befriended by Deputy Sheriff Dale Stewart…………………………………………3

     C.     Deputy Stewart exhibits behavior indicating
            his          sexual          interest          in          certain          male
Explorers……………………………….…4

     D.     BCSO identified serious concerns about Deputy Sheriff Stewart's
            behavior and chose not to investigate…………………………………………..6

     E.     Deputy          Stewart          sexually          harassed          and          abused
            Plaintiffs…………………………..7

     F.     The BCSO conducts and investigation of
            Deputy          Stewart,          leading          to          his          ultimate
conviction………………………………..8

III.     LAW AND ARGUMENT…………………………………………………………...9

     A.     Summary                                                                    Judgment

Standard…………………………………………………...9

     B.     Plaintiffs'                                                                Constitutional
            Claims………………………………………………10

            1.     Violations of The Due Process Clause
                   of the Fourteenth Amendment…………………………………………...10

                   a.     Defendant had a special relationship
                          with Plaintiffs and failed in its duty
                          to protect them from harm………………………………………11

                   b.     Defendant's actions created and increased
                          the     risk     of     the     danger     that     caused     Plaintiffs'
                          injuries……………..15

            2.     Defendant's                     Liability                     Under                     §

ii

1983……………………………………...…18

C.     Plaintiffs'                                    State                                    Law
Claims……………………………………………………...21

       1.     Defendant Is Not Entitled to Immunity
              from Plaintiffs' State Law Claims Pursuant
              To Chapter 2744 of the Ohio Revised Code………………………………..21

       2.     Plaintiffs were victims of workplace
              sexual harassment in violation of
              ORC §4112 and *Porter Paint*……………………………….……...27

              a.     Plaintiffs were employees for the
                     purposes of ORC §4112 and *Porter Paint*………………….…….....…28

              b.     Deputy Stewart was acting
                     within the scope of his employment
                     giving          rise          to          a          common          law
                     claim...……………………….…..30

              c.     Defendant failed to take appropriate
                     actions          to          prevent          harm          to
                     Plaintiffs……………………………...31

       3.     Plaintiffs have established a *prima facie*
              case                     of                     assault                     and
              battery………………………………………………...33

IV.    CONCLUSION………………………………………………………………...34

## I.    INTRODUCTION

This is a civil rights and tort action brought on behalf of Plaintiffs, Brandon McCroskey and Toby Andrews, alleging that Defendant, Butler County Sheriff's Office ("BCSO"), recklessly and indifferently allowed one of its supervisors to sexually harass and abuse Plaintiffs, then minors participating in BCSO's Explorers Program.  Plaintiffs have brought state statutory, common law, and constitutional claims, including violations of Plaintiffs' right to personal security and bodily integrity, intentional torts, and workplace sexual harassment.  Defendants have moved for summary judgment on all of Plaintiffs' claims. For the following reasons, Defendants' motion should be denied.

## II.    STATEMENT OF FACTS

### A.    The Butler County Sheriff's Office Explorers Program

The Butler County Sheriff's Office ("BCSO"), in conjunction with the non-profit organization, Learning-for-Life, operates an Explorers program for young people aged 14 to 21.[1] (Exs. 19 & 21 of Depo. of D. Berter).  The Explorers program is designed to provide junior and senior high school aged youth with training and experience in the field of law enforcement through planned activities, competitions, and mentorship.  (Ex. 21; D. Berter Depo. at 14-15; Paproski Depo. at 12).  Explorers' activities include traffic control, firearms training, criminal investigation, community service, performing support and security functions, and participating in "ride alongs" with police officers in their vehicles.  (Ex. 21; D. Berter Depo. at 26; McCroskey Depo. at 121 & 192-93).  Through Explorers' completion of these activities, the sponsoring police department gains the benefit of unpaid employees for its community outreach, event

---

[1] The program in fact is designed for all youth, male and female, who have an interest in pursuing a career in law enforcement. (Ex. 21).  Nevertheless, Defendant states that the Explorers Post program is designed for "young men." (Motion for Summary Judgment at 1).

security, and parking services while youth participants gain the benefit of training and a personal network of individuals employed within the law enforcement field. (D. Berter Depo. at 20-24). Participation in the Explorers program is a "career move" the same as an apprenticeship or internship program, which is helpful in attaining a position within law enforcement upon a participant's graduation from the program and high school. (Ginter Depo. at 31-33; Dennett Depo at 67-68; Paproski Depo. at 18 & 25). One Explorer summed up the connection between Explorer activities and reviews by the BCSO by stating, "[W]e didn't have to [participate], but ... it looks good if you do it." (Paproski Depo. at 18). Not surprisingly, many former-Explorers are promoted into paying jobs in law enforcement and public safety after they receive training in the BCSO's Explorers program. (Ginter Depo. at 31-33; Sandlin Depo. at 43; McCroskey Depo. at 8-10).

From approximately 1998 to 2002, Dan Berter served as the primary advisor of the BCSO's Explorers Post and was responsible for scheduling and supervising program activities. (Duke Depo. at 10). Deputy Berter was assisted in the program by police officers and volunteers serving as associate advisors. (D. Berter Depo. at 12-13). An individual could become an associate advisor to the Post without benefit of specific training or instruction for working with youth in groups or on a one-on-one basis. (Duke Depo. at 17-19; Farthing Depo. at 14-15). BCSO developed no policies regarding associate advisors' responsibility to report activities up a "chain of command." (Jones Depo. at 27-28). Similarly, BCSO never implemented screening requirements or procedures to determine an individual's qualifications or suitability for serving as an associate advisor. (Jones Depo. at 26; Farthing Depo. at 14-15; Dwyer Depo. at 22).

Just as the BCSO had no policies or procedures for selecting or screening associate advisors, the BCSO had no official policies or procedures designed to inform Explorers about

2

and protect them from sexual harassment and/or sexual assault. (Dennett Depo. at 63-64; Duke Depo. at 39). Explorers did not have copies of the standard operating procedures manual and were not told of the procedures contained within it. (Watts Depo. at 47; Dennett Depo. at 63-64; Sandlin Depo. at 40). Explorers were not told what to do if they were sexually harassed or assaulted. (Paproski Depo. at 74). Other than stating that Explorers could always "make a complaint . . . to that person in charge of the group," neither the Explorer Post advisors nor anyone at BSCO instituted any procedure or took any affirmative steps to inform anyone of what an Explorer should or could do to report an incident of sexual harassment or sexual assault. (Jones Depo. at 26). Finally, BCSO deputies were not even made aware of the one policy in place concerning romantic relationships between supervisors and subordinates, such as BCSO deputies and Explorers. (*Id*. at 36-37).

**B.      Plaintiffs join BCSO's Explorers Post and are befriended by Deputy Sheriff Dale Stewart.**

Butler County Deputy Sheriff Dale Stewart served as an associate advisor to the BCSO Explorers Post at all times relevant to this action until his arrest for two counts of sexual battery in 2000, including one count for the abuse of Plaintiff McCroskey. (McCroskey Depo. at 49-50 & 161; Dwyer Depo. at 34-35). In 1994, at approximately age 12, Plaintiff Brandon McCroskey joined BCSO's Explorers Post and shortly thereafter met Deputy Sheriff Dale Stewart who was serving as an associate advisor to the Post. (McCroskey Depo. at 50). In the fall of 1999, Plaintiff Toby Andrews also became an active member of BCSO's Explorer Post due to his interest in law enforcement and met Deputy Stewart at an Explorers meeting. (Andrews Depo. at 17, 19, & 21). Through his professional leadership and status as an associate advisor of the Explorers Post, Deputy Stewart gained the trust and admiration of Plaintiffs. (McCroskey Depo.

3

at 238; Andrews Depo. at 29).    However, regardless of how well liked and skilled he was, Explorers, BCSO deputies, and volunteers alike all knew that Deputy Stewart spent an unusual amount of Post and personal time with certain young boys participating in the Explorers program.  (D. Berter Depo. at 32; Duke Depo. at 31-34; Farthing Depo. at 21-23; T. Berter Depo. at 26-27; Ginter Depo. at 9-12, 23-25; Watts Depo. at 25-28)

### C.    Deputy Stewart exhibits behavior indicating his sexual interest in certain male Explorers.

Deputy Stewart was widely known within the Explorers Post and BCSO as someone who made lewd and inappropriate jokes and comments to his general audience. (Duke Depo. at 26-29; Watts Depo. at 39-42; Ginter Depo. at 9-12; Dennett Depo. at 17; Paproski Depo. at 32). Deputy Stewart's open discussion of sexual acts committed in the course of doing police work reflected unprofessionalism.  (Ginter Depo. at 14).  When Plaintiffs Andrews first met Deputy Stewart at an Explorers meeting, Deputy Stewart made sexual jokes and demonstrated at an Explorers meeting that, during a police pat-down, an officer can sexually satisfy himself by touching more of a suspect than is necessary.  (Andrews Depo. at 22). In discussing sex at Explorers meetings, Deputy Stewart was "kindof loud" and tried "to put [his comments] into a joke form." (Sandlin Depo. at  16).  Deputy Stewart made his sexual orientation and sexual escapades general topics of discussion.  (Dennett Depo. at 17-19; Ginter Depo. at 9-12, 14). Accordingly, Deputy Stewart's sexual orientation and experiences were often topics of gossip and humor throughout the BSCO. (Farthing Depo. at 27; Duke Depo. at 37-38; Ginter Depo. at 37-38).

Just as Deputy Stewart was known to frequently make sexual jokes, Deputy Stewart was notorious for having an unusual amount of one-on-one contact with certain young boys through

4

"ride alongs."  (Watts Depo. at 29-31; D. Berter Depo. at 27).  "Ride alongs" are designed to allow an Explorer to learn law enforcement through accompanying an associate advisor in a police vehicle. (Berter Depo. at 26).  However, Deputy Stewart would only travel in a car with certain boys. (Farthing Depo. at 23; Ginter Depo. at 12-15; Paproski Depo. at 46-47).  In fact, girls who repeatedly requested to accompany Deputy Stewart on "ride alongs" were refused so that Deputy Stewart could instead be accompanied by Plaintiff McCroskey, Plaintiff Andrews, or Jeff Sandlin.  (Watts Depo. at 29-31, 44; Paproski Depo. at 46-47; Ginter Depo. at 12-15).

Despite the Learning-for-Life Safety First Guidelines, which prohibited one-on-one contact with Explorers outside of "ride alongs," Deputy Stewart was known to spend an inordinate amount of personal time with Plaintiffs McCroskey and Andrews, and two other male Explorers, Jeff Sandlin, and Marc Dennett. (Affidavit of Dr. Kelley at 11; D. Berter Depo. at 32; Duke Depo. at 31-34; Farthing Depo. at 21-23; T. Berter Depo. 26-27; Ginter Depo. at 9-12, 23-25; Watts Depo. at 25-28).  Deputy Stewart spent so much visible time with these particular Explorers that observers began to suspect the motivation behind his extensive contact.  (Watts Depo. at 28).  For example, Explorer Amanda Watts  "thought it was strange that Dale being the age that he was wanted to hang out with a 13-year old boy all the time . . . pick him up, take him places.  I just thought it was strange." (*Id*.).  Additionally, those later interviewed by Detective Katie McMahon admitted that they had "thought that his kind of taking certain children, certain explorers as being – paid more attention to – they just thought that was weird."  (McMahon Depo. at 52).

By giving gifts and privileges to Plaintiffs McCroskey and Andrews, Jeff Sandlin, and Marc Dennett, Deputy Stewart ensured additional one-on-one time with these individuals.  (D. Berter Depo. at 46-47; Duke Depo. at 56; Paproski Depo. at 41-42; Sandlin Depo. at 11-12;

Dennett Depo. at 45-46).  Deputy Stewart gave a radio, set on a private channel, to Jeff Sandlin for personal communication with him.  (Sandlin Depo. at 11-12; McMahon Depo. at 35-37). Deputy Berter knew that Deputy Stewart was using the private channel, licensed to him individually by the FCC, to be in communication with Jeff Sandlin.  (D. Berter Depo. at 47-48). Deputy Stewart later gave a radio to Plaintiff McCroskey so the two could communicate privately on the same private channel.  (Duke Depo. at 56-57; Dennett Depo. at 45-46).

Finally, BSCO Deputies, including the primary advisor of the Explorer Post, were aware that Deputy Stewart prominently displayed photographs of himself with his arm around certain male Explorers.  (D. Berter Depo. at 49; Duke Depo. at 54-55).  Deputy Berter saw a photograph on Deputy Stewart's desk in which Stewart had his arm around Explorer Jeff Sandlin.  (D. Berter Depo. at 49).  Deputy Duke saw both the Stewart/Sandlin photograph and a later photograph of Stewart with his arm around Plaintiff McCroskey.  (Duke Depo. at 54-55).  Despite viewing such photographs, and despite later reporting to Detective McMahon that "between Dale Stewart and Sandlin, things just didn't seem right," Deputy Duke failed to report his suspicions or observations to anyone at BCSO.  (McMahon Depo. at 36; Duke Depo. at 55).

### D.    BCSO identified serious concerns about Deputy Sheriff Stewart's behavior and chose not to investigate.

The record reflects that BSCO officials knew that Deputy Stewart was likely participating in illegal behavior with Explorers.  Deputy Dan Berter, serving as the primary advisor to the BSCO Explorers Post, was informed in 1999 by Major Sizemore that an officer had expressed concerns to him regarding the excessive amount of time Deputy Stewart was spending with certain Explorers.  (D. Berter Depo. at 34).  Major Sizemore instructed Deputy Berter to monitor Deputy Stewart's behavior and report "anything out of the ordinary."  (*Id.* at

6

35).    Deputy Berter then met with associate advisors Jeff Duke and Cliff James and explained that concerns had been raised about whether Stewart might be molesting Explorers and they should watch Deputy Stewart's behavior around the Explorers.  (*Id*. at 35-36).

During the summer of 1999, Deputy Berter also conducted a meeting with Plaintiff Brandon McCroskey, Chris Paproski, and Amanda Watts, during which he told them to "keep an eye on" Deputy Stewart.  (Paproski Depo. at 24-25; McCroskey Depo. at 58-59).  Deputy Berter explained that "there was something going on and that detectives might contact [Explorers] and want to talk to [them]" about Deputy Stewart and his relationships with individual boys.  (Paproski Depo. at 25).  Despite Deputy Berter's advance notice and stated suspicions, detectives did not contact any Explorers to discuss Deputy Stewart or his behavior until more than a year later.  (Paproski Depo. at 26).  Evidently, BCSO's officers chose to ignore the clear danger that they admittedly believed Deputy Stewart posed to the Explorers.

### E.    Deputy Stewart sexually harassed and abused Plaintiffs.

Deputy Stewart's sexual harassment and abuse of Plaintiffs McCroskey and Andrews spanned from 1995 or 1996 to 2000.  (McCroskey Depo. at 135-36; Andrews Depo. at 41).  Deputy Stewart routinely sexually harassed and molested Plaintiff McCroskey by touching his genitals and making lewd and inappropriate comments.  (McCroskey Depo. at 66, 76, and 135-36).  During the summer of 1999, Deputy Stewart sexually assaulted Plaintiff McCroskey while at BCSO's Safety Camp.  (McCroskey Depo. at 109).  Attempting to escape the summer heat, Deputy Stewart and Jeff Sandlin invited Plaintiff McCroskey to sleep outside in a tent.  (*Id.* at 110).  However, Deputy Stewart brought a gun into the tent and proceeded to play with the boys' genitalia and sexually assault them.  (*Id.* at 126 & 128).  In that situation, Plaintiff McCroskey felt "paralyzed" to remain in place because "[a] man in a powerful position with a gun in a tent

wanting sexual favors [was] a threatening situation to [him]." (*Id.* at 125 & 128). On another occasion, Plaintiff McCroskey, while he was a passenger in a moving vehicle, was unable to prevent Deputy Stewart from fondling him. (*Id.* at 76).

Deputy Stewart sexually harassed and assaulted Plaintiff Andrews on at least two occasions in Deputy Stewart's patrol car. (Andrews Depo. at 35). During 2000, during an educational "ride along," Deputy Stewart rubbed Plaintiff Andrews' leg and felt his genitals. (*Id.* at 27). After this incident, Deputy Stewart molested Plaintiff Andrews frequently. (*Id.* at 29). After Plaintiff Andrews declined Deputy Stewart's offer to sleep with him at Safety Camp 2000, Plaintiff Andrews reported the invitation to Deputy Berter and Deputy Duke. (Andrews Depo. at 69).

### F.    The BCSO conducts and investigation of Deputy Stewart, leading to his ultimate conviction.

More than one year after BCSO officials became suspicious of Deputy Stewart's behavior, BSCO conducted an investigation concerning Deputy Stewart. (D. Berter Depo. at 39-40; Paproski Depo. at 25-26; McCroskey Depo. at 58-59; McMahon Depo. at 14-18). In the course of the BCSO's investigation, Detective Katie McMahon found evidence that Deputy Stewart had sexually harassed and assaulted at least four (4) Explorers – Brandon McCroskey, Toby Andrews, Jeff Sandlin, and Marc Dennett on multiple occasions. (McMahon Depo. at 50-52). However, in her final written report, Detective McMahon inaccurately reported that Deputy Stewart had harassed and assaulted *only two (2) Explorers* – Brandon McCroskey and Jeff Sandlin. (*Id.*). Detective McMahon explains her effort to conceal the abuse of Plaintiff Andrews and Marc Dennett "because this is public record here, and [the BCSO] tries to keep it at a minimum. I was just trying to be as brief as possible." (*Id.*). Rationalizing that Plaintiff

McCroskey and Jeff Sandlin were "more abused" than the others, the BCSO evidently sought to conceal and completely ignored the evidence that Deputy Stewart assaulted and harassed Plaintiffs and others while acting for BCSO's Explorers program, such as the fact that acts of sexual assault and harassment occurred in police vehicles during "ride alongs" by Explorers. (*Id*.). The BSCO did not subsequently provide counseling to Plaintiffs or recommend that they seek treatment as a result of their abuse. (*Id*. at 54-55).

Shortly after the BCSO's investigation, Deputy Stewart was charged with two counts of sexual battery and pled guilty to the charges. (McCroskey Depo. at 161-62). Deputy Stewart was sentenced to eight years in prison. (*Id*. at 84). At this point, *youth* members of the Explorers "took it upon [them]selves to go ahead and [create a policy manual]" for the protection of future Explorers from sexual harassment and abuse. (Dennett Depo. at 64).

### III.    LAW AND ARGUMENT

#### A.    Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, granting a motion for summary judgment is proper only when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998). In determining whether there exists a genuine issue of material fact, all inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). A court must inquire "whether the evidence presents a sufficient disagreement to require submission to a jury or if it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The court may not make credibility determinations or weigh the evidence when ruling on a motion for summary

judgment.  *Id.* at 255.

The burden is upon the <u>movant</u> to demonstrate the absence of a genuine issue of material fact.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  To carry its burden, the moving party must provide evidence that is uncontradicted and from disinterested witnesses.  *See Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133, 151 (2000).  To defeat a motion for summary judgment, all that need exist is one genuine issue of material fact.  *See Middleton v. Reynolds Metals Co.*, 963 F.2d 881 (6th Cir. 1992).  As discussed below, in the present case, there are genuine issues of material fact as to all relevant legal issues that preclude summary judgment.

**B.    Plaintiffs' Constitutional Claims**

**1.    Violations of The Due Process Clause of the Fourteenth Amendment**

Under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, states may not deprive individuals of life, liberty, or property without due process of law.  This constitutional protection is designed to prevent the state's deprivation of individual liberties and generally not intended to impose absolute constitutional liability on the state for any and all infractions.  *See DeShaney v. Winnebago County Dep't of Social Servs*., 489 U.S. 189, 195-96 (1989).  However, there are two exceptions to this general rule: (1) the "special relationship" exception; and (2) the "state-created danger" exception.  *See May v. Franklin County Bd. of Commissioners,* 2003 WL 1134499, *4 (6th Cir. Ohio) (Attached as Ex. A).  As discussed below, the state may be held liable for its failure to protect the health and physical well-being of an individual when it either, (1) fails in its affirmative duty to protect the individual; or (2) creates or increases the risk of physical harm actually suffered by an individual by virtue of its inaction.  *See id*.  Under both of these doctrines, a reasonable jury could find that

10

Defendant violated Plaintiffs' constitutional rights to personal security and bodily integrity as secured by 42 U.S.C. §1983 and the Due Process Clause of the Fourteenth Amendment.

> **a.    Defendant had a special relationship with Plaintiffs and failed in its duty to protect them from harm.**

A state assumes the affirmative duty to protect an individual's constitutional rights secured by the Due Process Clause of the Fourteenth Amendment where a "special relationship" exists between the state and an individual. *See DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 198 (1989).  A "special relationship" exists for these purposes where the state "restrains the victim's freedom," thereby preventing the victim from protecting himself. *Oldham ex rel. Young v. Cincinnati Public Schools,* 118 F. Supp.2d 867, 875 (S.D. Ohio 2000) (J. Speigel); *DeShaney*, 489 U.S. at 200 ("The affirmative duty to protect arises … from the limitations which [the state] has imposed on [the victim's] freedom to act on his own behalf."). State actors "at least must have restrained the person in some way that hindered his ability to protect himself," before a "special relationship" is established. *May v. Franklin County Bd. of Commissioners*, 2003 WL 1134499, *4 (6th Cir. Ohio).  However, it is not necessary that an individual be in state custody before the state owes the individual a duty of protection.  *See United States v. Lanier*, 520 U.S. 259, fn. 7 (1997) ("*DeShaney* does not hold . . . that there is no constitutional right to be free from assault committed by state officials themselves outside of a custodial setting.").

Plaintiffs had a "special relationship" with BCSO warranting protection based upon Stewart's confinement and restraint of Plaintiffs, thereby hindering their ability to protect themselves.  *See May v. Franklin County Bd. of Commissioners*, 2003 WL 1134499, *4 (6th Cir. Ohio).  The record reflects that Deputy Stewart regularly abused his authority and power over

Plaintiffs so as to restrain their freedom, thus enabling him to satisfy his sexual urges.  For example, Defendant's Deputy Stewart physically "restrained the victim's freedom" when, based upon his status and authority as a supervisor, he forced Plaintiff Brandon McCroskey to remain in a tent and be sexually assaulted under the threat of a gun.  *Oldham ex rel. Young,* 118 F. Supp.2d at 875; (McCroskey Depo. at 127-128).  Plaintiff McCroskey was again restrained and violated when Deputy Stewart fondled his penis inside an EMS vehicle.   (McCroskey Depo. at 76).  Similarly, Defendant's Deputy Stewart physically "restrained the victim's freedom" when he sexually assaulted Plaintiff Toby Andrews inside his patrol car.  *Oldham ex rel. Young,* 118 F. Supp.2d at 875; (Andrews Deposition at 27, 29, & 35).  By creating and maintaining for young people interested in law enforcement a program through which they would camp and participate in educational "ride-alongs" with Deputy Stewart, Defendant exercised control over Plaintiff's actions and abilities to react, creating a "special relationship" and a duty to ensure Plaintiffs were not violated.

Defendant claims that a "special relationship" between Plaintiffs and BCSO is precluded by the Sixth Circuit's decision in *Sargi v. Kent City Board of Education*, 70 F.3d 907 (6th Cir. 1995).  However, *Sargi* is easily distinguished from the instant case and relevant facts.  In *Sargi*, the plaintiff claimed that the school's mandatory attendance policy was a "restraint" sufficient to create a "special relationship."  *Id*.  In the present case, Defendant's Deputy Stewart placed actual, physical restraint upon Plaintiffs and proceeded to violate their persons. (McCroskey Depo. at 76 & 127-128; Andrews Depo. at 27, 29, & 35).  It was argued in *Sargi* that a special relationship was formed merely because Plaintiffs were required to attend school.   Here, however, a special relationship was formed because Plaintiffs were physically restrained and prevented from escaping.   Deputy Stewart was able to impose such restraint and exercise

physical control over Plaintiffs precisely because of the authority vested in him by Defendant and inherent in the structure of the Explorers program, making him the warped and unintended beneficiary of Defendant's program.  Deputy Stewart was able to and did impose physical restraint sufficient to prevent Plaintiffs from avoiding the harm, creating a "special relationship" that obligated BCSO to protect Plaintiffs' constitutional rights. *See May*, 2003 WL 1134499 at *6; *Oldham ex rel. Young,* 118. Supp.2d at 875.  Furthermore, in *Sargi,* the parent of a child with various medical conditions wanted to impose upon the government an affirmative duty to prevent a harm the government did not create, claiming school bus drivers had a duty to properly diagnose the child's medical episodes and administer emergency medical procedures on a school bus.  *See Sargi,* 70 F.3d  at 911.  In the present case, Plaintiffs ask the court to impose upon Defendant a duty to protect children participating in its Explorers program from the known threat posed by Defendant's own employees.

It should also be noted that in the "special relationship" between BCSO and children such as Plaintiffs, Deputy Stewart had a high degree of psychological restraint and control over Plaintiffs.  Deputy Stewart restrained Plaintiffs by relying on their fears of challenging superiors' authority.  (Ginter Depo. at 23; McCroskey Depo. at 87; Andrews Depo. at 146).  Plaintiff Andrews summarized Deputy Stewart's control by stating, "It was Dale's way or no way – he was always in control – who would believe me over him?"  (Andrews Depo. at 146).  Regarding the hierarchy of authority at BCSO, Explorer Matt Ginter explained, "We didn't want to disrespect authority or overstep those boundaries, so we just went along with it."  (Ginter Depo. at 23).  BCSO vested Deputy Stewart with the authority and ability to control the children that BCSO placed within the ambit of his authority.  As Plaintiffs' expert witness Dr. Thomas M. Kelley testifies,

13

> [A] recent report by Samuel Walker and Dawn Irlbeck in the Department of Criminal Justice at the University of Nebraska at Omaha, documented at least 72 cases of police officers' sexual abuse of teenage girls and boys. ... [S]ome 42% [of violations] involved police officers sexually victimizing adolescent minors in police-sponsored explorers programs. A number of these cases (like the present one) involved either multiple acts by a single officer or acts of sexual abuse by several officers. In short, the number of victims and incidents of misconduct far exceeded the number of "cases." The common theme in each of these cases was police officers using their law enforcement authority to take advantage of vulnerable adolescents. All police officers command authority by virtue of their positions. In all explorer-related cases, officers were dealing with young people in a special role of trust and authority which they ultimately violated.

(Affidavit of Dr. Kelley at 8) (Attached as Ex. B). Deputy Stewart also exercised control over his victims by asserting his role-model status and by "becoming such good friends" with them, that they "[were] afraid to turn [their] friend in." (Sandlin Depo. at 24). Deputy Stewart gained further psychological control over his victims by relying on their fear of the department's retaliation against them with regard to their chosen careers and investment of job training. (Paproski Depo. at 30; Dennett Depo. at 66). Explorers, who were adolescents interested in pursuing law enforcement careers, heard "advisors [say] that being a good explorer increased your chances of being hired by the Department." (Dennett Depo. at 66). Furthermore, Explorers understood that protesting the BCSO's treatment meant "it was guaranteed you're probably not going to ever see anything from them." (Paproski Depo. at 30). The "special relationship" between BCSO and Plaintiffs, in conjunction with the psychological control and restraint that Defendant's Deputy Stewart exercised over Explorers, created within the BSCO a constitutional duty to protect the bodily integrity of the participating minors.

> **b.** **Defendant's actions created and increased the risk of the danger that caused Plaintiffs' injuries.**

Under the "state-created danger" doctrine, the state's duty to protect an individual's constitutional rights arises "if the state creates a risk of harm to a citizen or renders that person

more vulnerable to danger." *May v. Franklin County Bd. of Commissioners*, 2003 WL 1134499, *4 (6th Cir. Ohio). "In these situations, the distinction between state action and state omission blurs, making it difficult to determine the state's role in creating the dangerous situation without examining the factual circumstances." *Robinson v. Township of Redford*, 2002 WL 31398974, *4 (6th Cir. Mich.) (Attached as Ex. C). Such a factual determination is properly made by a jury and precludes summary judgment. The Sixth Circuit has specifically found the <u>state actions'</u> <u>effects *on the individual causing harm to the victim* to be questions of fact properly decided by a</u> <u>jury.</u> *See May*, 2003 WL 1134499, *4 (6th Cir. Ohio) (The state assumed a duty of protection where the state's actions had "emboldened" an attacker, thus diminishing the attacker's fear of arrest and increasing the victim's likelihood of being harmed.)

Likewise, in the present case the conduct of BCSO "increas[ed] the risk that [Plaintiffs] would be deprived of life and liberty in violation of the substantive due process clause." *May*, 2003 WL 1134499, *4 (6th Cir. Ohio). First, the BCSO completely failed to "develop and implement written policies and procedures to inform Explorers and advisors about the nature, unacceptability, and consequences of sexual harassment and sexual abuse of Explorers." (Affidavit of Dr. Kelley at 15; Dennett Depo. at 63-65; Duke Depo. at 39;). In failing to take such a stand, the BCSO communicated to Deputy Stewart that his odds of being punished for such behavior were diminished, and thereby increased the risk that he would pursue and harm Plaintiffs. Simultaneously, the BCSO's failure to commit such a policy communicated to Plaintiffs that such topics were taboo and not to be discussed, or even reported. As such, a jury must assess how BCSO's actions affected Deputy Stewart and the likelihood that Plaintiffs would be harmed, as both are questions of fact. *See May*, 2003 WL 1134499, *4 (6th Cir. Ohio).

Similarly, BCSO failed to create and implement a procedure for either Explorers or

15

advisors to report sexual harassment, abuse, or suspicions of abuse.[2] (Paproski Depo. at 74; Jones Depo. at 26). Instead, the BCSO rationalized that Explorers could have always taken the initiative to complain if they objected to a superior's behavior. (Jones Depo. at 26). As Plaintiffs' expert Dr. Kelley reports,

> It is clearly naïve for a police agency to passively assume that adolescents as young as 13 and 14 years of age will take the initiative to report sexual abuse by an adult police officer. In fact, the literature consistently shows that most adolescent victims of sexual abuse either don't report the abuse, or find it extremely difficult to do so.

(Affidavit of Dr. Kelley at 15). Similarly, the BCSO made no efforts to screen, select, train, or monitor those individuals who would be serving as advisors and mentors to Explorer participants. (Duke Depo. at 17-18; Farthing Depo. at 14-15; Dwyer Depo. at 22; Jones Depo. at 26-28). The BCSO's willingness to ignore the dangers posed by operating under such a "procedure" rendered all Explorers more vulnerable to danger. *See May*, 2003 WL 1134499, *4 (6th Cir. Ohio).

Finally, the BCSO completely failed to investigate its early suspicions about Deputy Stewart's behavior in 1999. Deputy Berter testified that Major Sizemore informed him that concerns had been raised within BCSO regarding Deputy Stewart's interest in certain boys and the excessive amount of time he spent them. (D. Berter Depo. at 34). Despite BCSO's admitted awareness in 1999 of behavior raising "red flags," the BCSO chose not to investigate Deputy Stewart's behavior. (*Id.* at 35-36). Instead, Deputy Berter met with Explorers Brandon

---

[2] The principle is well established that an employer should create and implement mechanisms for employees to report incidents of sexual harassment in conjunction with its efforts to abide by Title VII. *See Kolstad v. American Dental Ass'n*, 527 U.S. 526 (1999). "Title VII is designed to encourage the creation of antiharassment policies and effective grievance mechanisms." *Id.* at 544 (citing *Burlington Indus. v. Ellerth*, 524 U.S. 742, 764 (1998)). The BCSO's failure to create any such policies demonstrates not only its indifference to rights under Title VII and comparable state law, but to the ability of any employee to protest and seek protection from violations of federal or state law.

McCroskey, Chris Paproski, and Amanda Watts and asked them to "keep an eye on" Deputy Stewart for inappropriate behavior. (Paproski Depo. at 24-25; McCroskey Depo. at 58-59). Rather than conducting an investigation, the BCSO asked the "hen house" to watch for a known "fox," recklessly endangering the Explorers. "Had an . . . investigation [of Deputy Stewart] occurred, approximately one year's worth of sexual harassment and sexual victimization of Toby Andrews and Brandon McCroskey by Deputy Stewart could have been prevented." (Affidavit of Dr. Kelley at 20).

Consistent with the BCSO's policy and custom of ignoring Deputy Stewart's behavior and the safety of Explorers, the BCSO made no policy or procedural changes in the Explorers program regarding the reporting and consequences of sexual harassment and abuse after Deputy Stewart's arrest and conviction. (Dennett Depo. at 64). "Incredibly, two explorers, Marc Dennett and Toby Andrews, took it upon themselves to produce an explorers' policy statement following the investigation" of Deputy Stewart. (Affidavit of Dr. Kelley at 20; Dennett Depo. at 64). Underscoring the fact that BCSO was indifferent to abuse suffered by Plaintiffs, Detective Katie McMahon reported only two (2) of Deputy Stewart's four (4) victims in her final report, reasoning "this is public record here." (McMahon Depo. at 50-52).

A reasonable jury could conclude from the analysis of all relevant facts, that Defendant's actions, (i.e., sponsoring the Explorers program, hiring and vesting Deputy Stewart with authority, placing Deputy Stewart in charge of minors, and choosing not to investigate a clear threat), (1) created a risk of danger that Deputy Stewart would harm the minors; and (2) greatly increased the likelihood that Deputy Stewart would have repeated opportunities to violate Plaintiffs and actually harm them.

### 2.    Defendant's Liability Under § 1983

An individual may bring a cause of action under §1983 when he is deprived of any "rights privileges, or immunities secured by the Constitution and laws," as a result of "any statute, ordinance, regulation, custom, or usage, of any State...." 42 U.S.C. §1983. The test for a claim under §1983 has two prongs: 1) whether the plaintiff has asserted the deprivation of a constitutional right; and 2) whether the defendant is responsible for that violation. *See Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992). First, a plaintiff must show that he has asserted the deprivation of a constitutional right. In this regard, courts have held that individuals have a Fourteenth Amendment liberty interest in freedom from bodily injury. *See Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987). This right to bodily integrity has been further defined to encompass the right not to be sexually assaulted under color of law. *See Doe v. Claiborne County, Tennessee*, 103 F.3d 495, 507 (6th Cir. 1996). Courts have also specifically held that individuals have a constitutional right to be free from sexual harassment. *See Cross v. State of Alabama*, 49 F.3d 1490, 1507 (11th Cir. 1995), citing to *Davis v. Passman*, 442 U.S. 228, 235 (1979).

Under the second prong, a plaintiff must show that the defendant is responsible for the violation of that right. Although local governments cannot be held liable under §1983 based on the theory of *respondeat superior*, they can be held liable if an officially-executed policy or the toleration of a custom, "even though such a custom has not received formal approval through the body's official decisionmaking channels," leads to, causes or results in the deprivation of a constitutionally protected right. *Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978). "For liability to attach, there must be execution of a government's policy or custom which results in a constitutional tort." *Gregory v. Shelby County*, 220 F.3d 433, 441 (6th Cir.

18

2000). The failure to train employees can itself exhibit a violation of §1983 if the failure to train amounts to deliberate indifference. *See City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Plaintiff must also establish a causal link and show that the injury occurred because of the execution of that policy or custom through the "acquiescence of a policymaker." *See Hubbard v. City of Middletown*, 782 F.Supp. 1573, 1578 (S.D. 1990) (J. Spiegel); *Garner v. Memphis Police Department*, 8 F.3d 358, 364 (6th Cir. 1993). Where no policies exist for the prevention of sexual harassment and/or the governance of contact with minors, and a municipality chooses not to create and implement such policies, the municipality sanctions the challenged behavior and its consequences. *See Hubbard v. City of Middletown*, 782 F.Supp. 1573, 1579 (S.D. 1990) (J. Spiegel).

Plaintiffs have established the first prong of the test, because they have the constitutional right to bodily integrity and to be free from sexual harassment and abuse. *See Webb v. McCullough*, 828 F.2d at 1158 (6th Cir. 1987); *Doe v. Claiborne County, Tennessee*, 103 F.3d at 507 (6th Cir. 1996); *Cross v. State of Alabama*, 49 F.3d at 1507 (11th Cir. 1995), citing to *Davis v. Passman*, 442 U.S. at 235 (1979). In the memorandum in support of its motion, Defendant has not contested that Plaintiffs have asserted the deprivation of a constitutional right. (Motion for Summary Judgment at 5-6).

Likewise, Plaintiffs have established the second prong of the test. Ultimately, Plaintiffs' constitutional rights were violated through BCSO's imposition of a policy condoning and showing deliberate indifference toward sexual harassment and abuse. Testimony reveals that advisors of the Explorers program were not provided instruction regarding the proper treatment of minors, sexual harassment, or sexual assault. . (Duke Depo. at 17-18; Farthing Depo. at 14-15; Dwyer Depo. at 22; Jones Depo. at 26-28). BCSO's failure to train its Explorer advisors in these

19

areas constituted deliberate indifference to the safety of the Explorer participants in violation of §1983. *See City of Canton v. Harris*, 489 U.S. 378, 389 (1989); *Hubbard v. City of Middletown*, 782 F.Supp. 1573, 1579 (S.D. 1990) (J. Spiegel).

Evidence also demonstrates that the BCSO should have known of Deputy Stewart's actions and had actually received reports of Deputy Stewart's strange and inappropriate behavior with the Explorers. Deputy Stewart's pervasive sexual innuendo and comments "would really make somebody think if they were really paying attention." (Sandlin Depo. at 44). Deputy Berter stated in his deposition that Major Sizemore asked him to monitor Deputy Stewart because of the excessive one-on-one time being spent with certain male Explorers. (D. Berter Depo. at 34). Deputy Berter then instructed *the Explorers themselves* to "keep an eye on" Deputy Stewart and that detectives might want to question them about Deputy Stewart. (Paproski Depo. at 24-25; McCroskey Depo. at 58-59).

Ultimately, the moving force behind BCSO's failure to protect Explorers through the implementation of polices, BCSO's failure to investigate its suspicions regarding Deputy Stewart, and BCSO" failure to train and supervise its Explorer advisors was its indifference to the well-being and constitutionally protected rights of Plaintiffs. *See City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Such evidence, viewed in a light most favorable to Plaintiffs, could lead a reasonable juror to conclude that the BCSO knew of Deputy Stewart's propensity to harass and harm Explorers. *See Hubbard v. City of Middletown*, 782 F.Supp. 1573, 1579 (S.D. 1990) (J. Spiegel). As the BCSO failed to take any preventative or disciplinary action to protect Plaintiffs, a reasonable juror could further conclude that the BCSO is liable to Plaintiffs. Therefore, summary judgment on Plaintiffs' constitutional claims must be denied.

20

C.     **Plaintiffs' State Law Claims**

1.     **Defendant Is Not Entitled to Immunity from Plaintiffs' State Law Claims Pursuant to Chapter 2744 of the Ohio Revised Code**

In its motion for summary judgment, Defendant claims full immunity from liability on the basis of Ohio Revised Code Ch. 2744.  (Motion for Summary Judgment at 12). However, an application of the facts to the three-part analysis of ORC Ch. 2744 establishes that Defendant is not entitled to immunity.

Political subdivisions are granted immunity from liability for individuals' injuries by virtue of ORC §2744.01(A).  However, under the second part of the §2744 analysis, a political subdivision looses this statutory immunity if the plaintiff's claims fall into one of the five categories listed in ORC §2744.02(B). [3]  *See Cater v. Cleveland*, 697 N.E.2d 610 (Ohio 1998).  If the political subdivision is denied immunity on this basis, it may regain its immunity by successfully claiming a defense listed in ORC §2744.03, the third part of the analysis.  *See id.* On the basis of its status as a political subdivision, Defendant has claimed immunity under §2744.01(A) and seeks summary judgment on Plaintiffs' state law claims.  (Motion for Summary Judgment at 12).  While Plaintiffs concede that Defendant is a political subdivision, Defendant's immunity cannot survive the remaining two parts of the §2744 analysis, rendering Defendant subject to civil liability.

Turning to the second step in the immunity analysis completely neglected by Defendant,

---

[3] Defendant submits that none of the § 2744.02(B) exceptions to immunity apply to Plaintiffs' claims because Plaintiffs had not previously "pled" them.  (Motion for Summary Judgment at 12).  However, Plaintiffs were not under any obligation to preemptively "plead" a statutory exception in anticipation of Defendant's *affirmative* immunity defense.  *See e.g. U.S. Gypsum Co. v. Indiana Gas Co. Inc.,* 350 F.3d 623, 626 (7th Cir. 2003), citing *Gomez v. Toledo*, 446 U.S. 635 (1980).  Indeed, even in qualified immunity cases, not at issue here, the assertion of an immunity defense does not alter a party's pleading obligation.  *See Goad v. Mitchell*, 297 F.3d 497 (6th Cir. 2002).  Defendant is obligated to *establish* its right to an affirmative defense.  As Defendant has done no more than assert its entitlement to immunity without any specificity or allusion to the factual record, its motion for summary judgment fails as a matter of law.

it is clear that Defendant's actions, while committed by a political subdivision, fall squarely into the exception to immunity found in §2744.02(B)(4). *See Hubbard v. Canton City School Bd. of Educ.*, 780 N.E.2d 543 (Ohio 2002). At the time Defendant's employees committed negligent actions that resulted in Plaintiffs' injuries, the language of §2744.02(B)(4) was as follows:

> [P]olitical subdivisions are liable for injury, death, or loss to person or property that is caused by the negligence of their employees and that occurs within or on the grounds of buildings which are used in connection with the performance of a governmental function . . ..[4]

The Supreme Court of Ohio's decision in *Hubbard v. Canton City School Board of Education* provides the governing analysis and law concerning this statutory provision. *See* 780 N.E.2d 543 (Ohio 2002).

Much like this case, in *Hubbard* negligence actions were brought against a school board for a teacher's sexual assault of two female students at a public middle school. *See id.* at 545. Because the school board itself had negligently employed the teacher and failed to supervise him, and because that negligence "occurr[ed] on the grounds of a building used in connection with a government function," the court found that ORC §2744.02(B)(4) precluded immunity. *Id.* at 547. In its decision, the court explicitly noted its obligation to "apply the words of the law in effect at the time the alleged negligent acts occurred." 780 N.E.2d at 547 (Ohio 2002). Based upon the "plain and ordinary meaning" of Ch. 2744.02(B)(4), the court found "the [§2744.02(B)(4)] exception is not confined to injury resulting from physical defects of negligent use of grounds or buildings," but imposes liability where negligent actions occur *within or on*

---

[4] On April 9, 2003, an amended version of §2744.03(A)(5) became effective. Under the amended version, a political subdivision can be made liable if injuries are caused by negligence "due to the physical defects within or on the grounds" of the government buildings at issue. However, the court must apply the version of the statute in effect at the time of the relevant incidents, which neither included nor has been interpreted to include such amended language. *See Hubbard v. City School Bd. of Educ.*, 780 N.E.2d 543, 547 (Ohio 2002).

such grounds or buildings. *Id.* at 546-47. As a result of this analysis, the school board was found to be without immunity and potentially civilly liable. *See id.* at 547. The Ohio Supreme Court's ruling in *Hubbard* controls in this case, as the law was the same during all relevant events in both cases and, in both cases, plaintiffs ultimately sustained injuries from the defendants' negligent decision making that occurred within government walls.

In the present case, BCSO negligently allowed its employee, Deputy Stewart, to remain a sheriff, keep close contact with minors, and have unsupervised authority over minors in officially sponsored activities, despite BCSO's knowledge and concern that Deputy Stewart was likely to sexually harass and assault minors. These negligent acts occurred within government walls. The BCSO owed a duty of care Plaintiffs participating in the Explorers program and breached that duty by failing to protect Explorers from sexual harassment and assault by failing to supervise Explorer advisors and failing to instruct others. *See Hubbard*, 780 N.E.2d 543 (Ohio 2002). Furthermore, because Deputy Stewart sexually molested and abused Plaintiffs from within the confines of government property (i.e. a patrol car) and on grounds "used in connection with" government functions, (i.e. a BCSO sponsored camp), Defendant owed a duty of care for Plaintiffs' protection. §2744.02(B)(4). According to Plaintiffs' expert Dr. Kelley, the record demonstrates that, "the general possibility of explorer sexual abuse by police, and the specific possibility of sexual victimization of Brandon McCroskey and Toby Andrews by Deputy Dale Stewart were highly foreseeable" in light of the complete absence of written policies and procedures within the department to prevent sexual harassment and abuse. (Affidavit of Kelley at 14-18). Together with the BCSO's failure to implement policies for the selection of advisors and investigate concerns, the BCSO demonstrated negligence. (*Id.* at 19-20). Therefore, Defendant is stripped of statutory immunity by virtue of §2744.02(B)(4).

23

Finally, under Ohio Revised Code §2744.03(A)(5), a political subdivision may attempt to re-establish its immunity from civil liability damages. *See Cater v. Cleveland*, 697 N.E.2d 610 (Ohio 1998). However, the subdivision's wanton or reckless exercise of judgment will prevent it from re-establishing its immunity under the third part of the §2744 analysis. Under §2744.03(A)(5),

> The political subdivision is immune from liability if the injury, death, of loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources *unless the judgment or discretion was exercised . . . in a wanton or reckless manner.*

(Emphasis added). With respect to §2744, "[w]anton conduct involves the failure to exercise 'any care whatsoever toward those to whom he owes a duty of care, and his failure occurs under the circumstances in which there is great probability that harm will result.'" *Galdon v. Greater Cleveland Regional Trans. Auth.*, 662 N.E.2d 287, 294 (Ohio 1996) (quoting *McKinney v. Hartz & Restle Realtors, Inc*., 510 N.E.2d 386, 388 (Ohio 1987)). For these purposes, the Supreme Court of Ohio has defined "reckless" as "knowing *or having reason to know* of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater that that which is necessary to make his conduct negligent." *Marchetti v. Kalish*, 559 N.E.2d 699, 700, fn.2, quoting 2 Restatement of the Law 2d, Torts (1965) 587, Section 500 (Emphasis added). Whether an actor behaved "wantonly" or "recklessly" is a question of fact reserved for a jury. *See Fabrey v. McDonald Village Police Dept.*, 639 N.E.2d 31, 35 (Ohio 1994).

Because juries decide whether an act or omission was "wanton" or "reckless," courts generally do not grant summary judgment where §2744.03(A)(5) is at issue. *See Cater v. Cleveland*, 697 N.E.2d 610, 618 (Ohio 1998) (Whether governmental entity was "reckless"

under §2744.03(A)(5) in training employees for emergencies is a question for a jury); *Sharp v. Scioto County Joint Vocational School*, 2001 WL 1085297, *7 (Ohio App. 4 Dist.) (Attached as Ex. D) (Genuine issues of material fact found where evidence could indicate that government failed to adequately train students.); *Charles v. Cardington-Lincoln Loc. Sch. Dist.*, 1996 WL 488847, *3-5 (Ohio App. 5 Dist.) (Attached as Ex. E) (Genuine issues of material fact found where some evidence existed to show government entity failed to provide safe equipment and failed to properly train students). If any evidence exists to support a finding of "recklessness" or "wantonness," summary judgment must fail. *See Sharp*, 2001 WL 1085297 at *6. Indeed, evidence of acts of omission in a wanton or reckless manner is sufficient to meet the burden of §2744.03(A)(5) for the purposes of summary judgment. *See Charles v. Cardington-Lincoln Loc. Sch. Dist.*, 1996 WL 488847, *3-5 (Ohio App. 5 Dist.).

In viewing the evidence in the light most favorable to Plaintiffs, Plaintiffs have demonstrated that Defendant acted in a wanton or reckless manner. The BCSO knew that Deputy Stewart posed a physical threat of harm to Explorers for at least one year before it conducted an investigation. (Paproski Depo. at 25-26; McCroskey Depo. at 58-59). BCSO deputies were concerned about the excessive amount of one-on-one time spent between Deputy Stewart and certain boys involved in the Explorers program, viewed Deputy Stewart's photographs of certain such boys in his office, and failed to exercise any care for the young male Explorers' protection. (Duke Depo. at 32-33; Farthing Depo. at 21-23; D. Berter Depo. at 32 & 49). The BCSO failed to create any set of rules governing employees' contact with minor Explorers or affirmatively instructing employees how to handle suspected harassment and/or abuse. (Duke Depo. at 17-19; Farthing Depo. at 14-15). The BCSO failed to use or create any methods by which associate advisors could be screened or investigated prior to working with the

children in BCSO's care. (Jones Depo. at 26; Farthing Depo. at 14-15; Dwyer Depo. at 22). Finally, the BCSO failed to instruct the Explorers on the topic of sexual harassment and abuse and failed to provide a means by which Explorers could report incidents of such. (Paproski Depo. at 74; Watts Depo. at 47; Dennett Depo. at 63-64; Sandlin Depo. at 40). The BSCO's repeated and gross failures to take any measures for the protection of Explorers could lead a reasonable juror to find the BCSO acted "wantonly" and "recklessly." Accordingly, Defendant is not entitled to immunity from Plaintiffs' state law claims and summary judgment cannot be granted in its favor.

> **2.    Plaintiffs were victims of workplace sexual harassment in violation of ORC §4112.02 and *Porter Paint*.**

In Ohio courts, federal case law interpreting Title VII of the Civil Rights Act of 1964 is applicable to cases involving alleged sexual discrimination in violation of ORC § 4112.02. *See Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civil Rights Comm.*, 421 N.E.2d 128 (Ohio 1981). Therefore, as same-sex sexual harassment is actionable under Title VII, such harassment is also actionable under ORC § 4112.02 and Ohio common law preventing discrimination in the workplace. *See id.*; *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75 (1998). Furthermore, as Title VII "should be given a liberal construction," ORC § 4112.02 should be read and understood in an equally expansive manner. *Armbruster v. Quinn*, 711 F.2d 1332, 1336 (6th Cir. 1983).

Under Title VII, and ORC § 4112.02, an employer is "subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate or successively higher authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). Under Ohio common law, an employer may also be held liable for the

tort of sexual harassment where either: (1) the harasser is acting within the scope of his or her employment duties, or; (2) the employer knew or should have known of the harasser's potential to cause harm and failed to take any preventative action. *See Kerans v. Porter Paint Co.*, 575 N.E.2d 428, 432 (Ohio 1991). Thus, as it cannot be disputed that Deputy Stewart sexually harassed Plaintiffs, if ORC § 4112.02 applies, Defendant is liable to Plaintiffs thereunder. Moreover, on the record presented, it is clear that Defendant may also be liable under *Porter Paint*.

> a.   **Plaintiffs were Defendant's employees for the purposes of O.R.C. §4112.02 and *Porter Paint*.**

Under applicable law, Plaintiffs were at all relevant times Defendant's employees for the purposes of O.R.C. §4112.02 *et seq.* and Ohio common law. Courts construe the term "employee" broadly consistent with the legislative history and purpose of Title VII of the Civil Rights Act of 1964. *See Dunlop v. Carriage Carpet Co.*, 548 F.2d 139 (6th Cir. 1977) (Holding that former employees were "employees" for the purposes and goals of Title VII); *Armbruster v. Quinn*, 711 F.2d 1332 (6th Cir. 1983); *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) (Former employees were found to be "employees" for the purposes of Title VII). The express language of Title VII indicates that Congress intended its statutory protections to apply to programs precisely like the Explorers. Section 703 of Title VII (42 U.S.C. §2000e-2(d)), provides that it is an unlawful employment practice for an employer to "discriminate against any individual . . . [in] employment [or] any program established to provide apprenticeship or other training." *Id*.

Likewise, ORC §4112.02 applies to apprentice "training programs" such as the Explorers. ORC §4112.02 (D). More broadly, the operative section of ORC §4112.02 prohibits sex discrimination, which includes sexual harassment, in "any matter directly or indirectly

27

related to employment." ORC §4112.02 (A).  Properly construing these provisions in the broad remedial fashion prescribed by the courts, it is clear that the Explorers are covered by the protections of ORC §4112.  To this end, the Sixth Circuit has found individuals to be "employees" where such individuals are "susceptible to the kind of unlawful practices that Title VII was intended to remedy."  *Armbruster v. Quinn*, 711 F.2d at 1342.  Employees are susceptible to an employer's abuse by virtue of the employer's control over the performance of their work or career progression.  Accordingly, a fundamental distinguishing element of the employer-employee relationship is the right of control over the individual's actions, conduct, and work or training.  *See Bd. of Education v. Rhodes*, 162 N.E.2d 888, 896 (Ohio App. 10 Dist. 1959).

Consideration of the economic benefit an employee can hope to receive as a result of service to the employer is also helpful in determining whether an individual is an "employee" for the purposes of Title VII.  *See Armbruster v. Quinn*, 711 F.2d 1332 (6th Cir. 1983).  Economic benefits sufficient to create an employment relationship can arise from opportunities for advancement bestowed upon the employee as result of affiliation with the organization.  *Id.* at 1342, n.9.  Therefore, an expectation of compensation in the form of a career opportunity bringing economic benefit, renders an individual an "employee."  *See id*.

In the present case, the testimony is unequivocal that the Explorers program is viewed by participants and the BCSO as a training or apprenticeship program.  (Ginter Depo. at 31-33; Dennett Depo. at 67-68; Paproski Depo. at 18 & 25).  Interpreting ORC §4112.02 consistent with Title VII as provided by Ohio law, Explorers are entitled to the statutory protection afforded employees.  This result is logical considering that, like employees, Explorers' activities and work duties are completely controlled by the BCSO and its deputies.  (Andrews Depo. at 146; Ginter

28

Depo. at 23). Explorers are told what duties to perform, what role to take, and where they stand in the hierarchy of authority and power within the BCSO. (Ginter Depo. at 23; Paproski Depo. at 18). Explorers clearly assist and support the BCSO with the performance of its governmental function. Explorers complete their duties with the hope of gaining future employment in law enforcement and the accompanying economic benefit. Repeatedly, Explorers testified that involvement within the Explorers program, itself touted as a "Program for Career Education," was in preparation for a career in law enforcement and designed to provide an "edge" in ultimately obtaining a job. (Ex. 19; Ginter Depo. at 31-33; Dennett Depo at 67-68; Paproski Depo. at 18 & 25). Accordingly, Plaintiffs were Defendant's employees under applicable law. As such, Defendant is liable to Plaintiffs under ORC §4112.02.

> **b.    Deputy Stewart was acting within the scope of his employment giving rise to a common law claim.**

Under the doctrine of *respondeat superior*, an employer is responsible for the acts of its employees if they are acting within the scope of their employment. *See Kerans v. Porter Paint Co.*, 575 N.E.2d 428, 432 (Ohio 1991). "[W]here an employee is able to sexually harass another employee because of the authority or apparent authority vested in him by the employer, it may be said that the harasser's actions took place within the scope of employment." *Id.*; *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986). Other factors to be considered in determining the "scope" of employment are the time and location of alleged violations. *See id.* at 432.

The BCSO made Deputy Stewart Plaintiffs' supervisor. Deputy Stewart's harassment and abuse of Plaintiffs occurred during activities sponsored and sanctioned by the BCSO. Deputy Stewart molested Plaintiffs McCroskey and Andrews during Explorer "ride alongs" in patrol cars. (McCroskey Depo. at 66, 76, and 135-36; Andrews Depo. at 35). Deputy Stewart

29

further abused Plaintiff McCroskey during the BCSO's Safety Camp. (McCroskey Depo. at 109). Deputy Stewart's authority and control over Explorers, vested in him by the BCSO, ultimately enabled him to commit acts against Plaintiffs with impunity.

Deputy Stewart was known to reward Explorers with whom he had relationships and provide Explorers incentives for their personal companionship. (Sandlin Depo. at 11-12; McMahon Depo. at 35-37). By virtue of his job as a sheriff's deputy and his participation in the BCSO's Explorers Program, Deputy Stewart exercised the authority over Plaintiffs within the context of the Explorers program. (Sandlin Depo. at 24; Andrews Depo. at 30). Deputy Stewart understood that Plaintiffs desired careers in law enforcement and Plaintiffs feared retaliation from the BCSO for raising complaints. (Ginter Depo. at 31-33; Dennett Depo at 67-68; Paproski Depo. at 18 & 25). Using their career hopes and fears against them, Deputy Stewart used his position of authority to harass, molest, and violate Plaintiffs.

        c.    **Defendant failed to take appropriate actions to prevent harm to Plaintiffs.**

Even where an employee's actions are outside the scope of his or her employment, an employer has the obligation to take appropriate action where it knows or should know of an unreasonable risk of harm posed by the employee. *See Kerans v. Porter Paint Co*., 575 N.E.2d at 432 (Ohio 1991). "Whether the employer has acted appropriately in a particular situation is a *factual matter to be determined on a case by case basis.*" *Id*. (Emphasis added). Summary judgment is improper in the present case because a reasonable juror could conclude that the BCSO failed to take appropriate actions based upon Deputy Stewart's recognized, *and recognizable*, behavior.

Defendant knew that Deputy Stewart was acting inappropriately with certain young boys

in the Explorers program as early as 1999. (D. Berter Depo. at 34-36; Paproski Depo. at 24-25; McCroskey Depo. at 58-59). In his deposition, Deputy Berter testified to awareness of Deputy Stewart's propensity to spend large amounts of time and attention on certain young boys. (D. Berter Depo. at 34). Deputy Berter told Deputies Jeff Duke and Cliff James, as well as Explorers Chris Paproski, Amanda Watts, and Brandon McCroskey, to watch Deputy Stewart for strange behavior because he was suspected to be acting inappropriately. (D. Berter Depo. at 35-36; Paproski Depo. at 24-25; McCroskey Depo. at 58-59). Such testimony, viewed in a light most favorably to the non-moving party, presents genuine questions of fact regarding what Defendant knew and when Defendant knew it.

The evidence also presents material questions of fact regarding what Defendant *should have* known about Deputy Stewart's behavior. Testimony reveals that Defendant knew Deputy Berter spent unusually large amounts of time with certain young male Explorers. (D. Berter Depo. at 32; Duke Depo. at 32-33; Farthing Depo. at 21-23; T. Berter Depo. at 13-14, 26). Defendant knew that Deputy Berter had photographs of himself with some of the same young male Explorers on his office desk and that he provided them radios so they could communicate on a private frequency. (D. Berter Depo. at 47-48; Duke Depo. at 56-57). Defendant further knew that Deputy Stewart would take certain young boys on "ride alongs" in his patrol car. (D. Berter Depo. at 27; Farthing Depo. at 23; Ginter Depo. at 12-15; Paproski Depo. at 46-47). Deputy Stewart's sexuality was a general topic of gossip, in part due to his frequent sexual jokes and lewd comments around the BCSO. (Duke Depo. at 26-29 and 37-39). These factors, taken as a whole by someone "paying attention," could lead a reasonable juror to find that the BCSO should have been aware of the danger posed by Deputy Stewart's close and unmonitored interaction with young boys. (Sandlin Depo. at 44). Accordingly, summary judgment is not

appropriate with respect to Plaintiff's claims under Ohio common law as established in *Kerans v. Porter Paint Co.*, 575 N.E.2d 428 (Ohio 1991).

### 3. Plaintiffs have established a *prima facie* case of assault and battery.

The available evidence readily establishes Plaintiffs' *prima facie* case of assault and battery under ORC §2305.11.1 and Ohio common law.[5] Defendant does not contest that Deputy Stewart repeatedly sexually harassed and abused Plaintiffs when he served as an associate advisor for the Post. (Motion for Summary Judgment at 1-3). When Plaintiffs were minors participating in the Defendant's Explorers program, Deputy Stewart sexually harassed and molested Plaintiffs on multiple occasions. (McCroskey Depo. at 135-36; Andrews Depo. at 41). Deputy Stewart admitted to such activity and was convicted and sentenced in state court. (Dwyer Depo. at 34-36). Plaintiffs have claimed that Defendant knew Deputy Stewart's conduct and propensities and took no action to prevent the harm that ensued. (Amended Complaint at 5-7). As discussed in the previous sections of Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment, material issues of fact exist regarding the BCSO's ultimate liability for the intentional acts of its employee, Deputy Stewart. (Memorandum in Opposition at Sections III (B) and (C)). Accordingly, Defendant's motion must fail.

### IV. CONCLUSION

For the reasons stated above, summary judgment cannot be granted on any of Plaintiffs' claims.

Respectfully submitted,

---

[5] Defendant did not address Plaintiffs' state law claims in its motion, except to argue that it is immune from liability. (Motion for Summary Judgment at 11-12). Defendant bears the burden on summary judgment to demonstrate the absence of material issues of fact with respect to its claim of immunity under ORC §2744. Other than identifying itself as a political subdivision, Defendant has done nothing to support its claim of immunity. Accordingly, summary judgment may not be granted on these issues. *See Adickes v. S.H. Kress Co*., 398 U.S. 144 (1970).

MEZIBOV & JENKINS, LLP


_/s/ Marc D. Mezibov_____
MARC D. MEZIBOV (Ohio Bar No. 0019316)
CHRISTIAN A. JENKINS (Ohio Bar No. 0070674)
SUSAN E. BRABENEC (Ohio Bar No. 0075200)
1726 Young Street
Cincinnati, Ohio 45202
Telephone (513) 723-1600
Telecopier (513) 723-1620

Counsel for Plaintiffs


## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was served upon Jack C. McGowan, 246

High Street, Hamilton, Ohio 45011, by electronic service and U.S. mail postage prepaid, this

29th day of December, 2003.


_/s/ Marc D. Mezibov_____
MARC D. MEZIBOV (Ohio Bar No. 0019316)

33