IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| BRANDON McCROSKEY, et al | : | CASE NO. **1:01cv429** |
| Plaintiffs | : | (Judge Spiegel) |
| -vs- | : | **REPLY MEMORANDUM OF DEFENDANT IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |
| BUTLER COUNTY SHERIFF'S OFFICE | : | |
| Defendant | : | |

::: ::: ::: :::

Now comes defendant the Butler County Sheriff's Office ("BCSO") and for its reply memorandum in response to the memorandum in opposition to defendant's motion for summary judgment does hereby state as follows:

## I. FACTS

In plaintiffs' statement of facts, there are a number of characterizations of fact which need clarification. First, Plaintiffs attribute to Deputy Berter that explorers were "unpaid employees" who performed "security functions." (Plaintiffs' Memo., pp. 1-2) However, Deputy Berter's deposition does not support these claims. (D. Berter Depo., p. 20-24 & 26). Berter specifically testified as to this point:

> Q. Did the explorers ever assist in providing security at events, fairs, that sort of thing?
> A. Not security. They would assist with parking. They would be permitted to walk throughout the fair. But there was – there was deputy sheriffs on duty that provided the security for the events.

(D. Berter Depo., p. 22) Even Sheriff's Department deputies were not on the clock when participating in Explorers post activities. (Jones Depo., p. 28; D. Berter Depo., pp. 18-19)

Plaintiffs imply there should have been some special screening to allow deputies to become associate advisors. However, the BSCO had an extensive screening process for its employees. (Jones Depo., p. 26) This screening process was developed in light of the fact deputies of the BCSO would have interactions with all segments of society in any number of

settings. There was an application required to be filled out, a polygraph test administered, a background check completed, interviews and a drug test. (Jones Depo., p. 14) Included in this screening were psychological testing and an interview by a mental health professional. (Jones Depo., pp. 17-19) While, the screening varied from employee to employee, Stewart himself had extensive training and experience. (Jones Depo., p. 37, Exhibit 10) Stewart was also a Certified State of Ohio Peace Officer. (Jones Depo., p. 37, Exhibit 10, p. 175). He had also served in several public capacities including security for Miami University, The Butler County Emergency Management Agency and Kings Island without incident. (Jones Depo., pp. 16, 37-38, Exhibit 10)

With respect to the Explorers, there was a chain of command for evaluation and for the granting of permission for certain activities. (Jones Depo., pp. 27-28) Moreover, the BSCO <u>did</u> have a sexual harassment policy. (Jones Depo., pp. 10-12, Exhibits 8 & 9) The policy even applied to non-employees. (Jones Depo., p. 13) It is significant that as soon as the BCSO learned of the allegations of plaintiffs Deputy Berter reported to his superior. (D. Berter Depo., pp. 39-40) On July 26, 2000, a formal investigation had started and Stewart was suspended. (Dwyer Depo., pp. 27, 35-37, Exhibits 5 & 6) While plaintiffs state there was an attempt to conceal the abuse, (Plaintiffs' Memo., p. 9), a closer review of the testimony of Sergeant McMahon reveals she made a discretionary decision which charges should be brought—the two most serious, two felony counts of the third degree. (McMohan Depo. Pp. 49-51, Exhibit 24). Had McMahon's intention been to conceal abuse, she could have reported only one case with a lesser charge.

## II.    CONSTITUTIONAL CLAIMS

The plaintiffs claim there was a special relationship between them and the BCSO conferring a duty to protect upon the BCSO in their favor. (Plaintiffs' Memo., p. 11) However, the special relationship exception has been constrained to particular circumstances, as noted by the court in <u>Oldahm ex rel. Young v. Cincinnati Public Schools</u>, 118 F. Supp. 867, 874 (S.D.

Ohio 2000)(quoting Deshaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 200 (1989)(internal quotations omitted)), not present here:

> The affirmative duty to protect arises not from the State's knowledge of the individual's predicament . . . it is the State's affirmative act of restraining the individual's freedom to act on his own behalf–through incarceration, institutionalization, or other similar restraints of personal liberty–which is the deprivation of liberty triggering the protections of the Due Process Claus [and] not its failure to act to protect his liberty against harms inflicted by other means.

The Supreme Court has refused to translate traditional court law claims into due process deprivations. Oldahm ex rel. Young, 118 F. Supp. 875 (S.D. Ohio 2000)(citing Deshaney, 489 U.S. at 202). Plaintiffs cite May v. Franklin County Bd. Of Commissioners, 2003 WL 1134499 (6th Cir. (Ohio) March 12, 2003) as supportive of their position of a special relationship in the instant case. (Plaintiffs' Memo., p. 12) However, May specifically held there was no special relationship. Id., at 5-6.

In several cases, the courts have declined to find special relationships or state-created danger. In Doe v. Claiborne County, Tenn., 103 F.3d 495, 505 (6th Cir. 1996), the court examined sexual abuse by a school teacher, Davis, upon a student, Doe, and determined there was no special relationship to hold the school liable. At the time of the abuse, Davis was a boys' physical education teacher at Soldiers Memorial Middle School and coach at Soldiers and Claiborne County High School. Id. at 500-501. Davis had been employed at a different school, Midway, by the same school system prior to the incidents with Doe. Id. Davis had been accused of abuse while at Midway, claims which were investigated by the Department of Human Services ("DHS"). Id. at 501-502. DHS notified the superintendent of its investigation and that Davis should not have access to any child until further notice. Id. at 502. Four of the nine cases were determined to be "founded", but Davis escaped any action by DHS. Id. at 502. Subsequently, Davis was rehired, id. at 503, and abused a female freshman student while on the school bus while en route to games and while at a game, id. at 501. These interactions escalated into phone

calls, gift giving, and eventually sexual intercourse. Id. Tennessee had a in loco parentis statute; however, the court in reviewing the district court's ruling on summary judgment, quoting Deshaney, held

> "the Constitution imposes no duty on the state to protect individuals from the harm suffered at the hands of a private actor, especially where 'it played no part in the creation of the danger, nor did it do anything to render him any more vulnerable to [it]'. Id. at 201, 109 S.Ct. At 1006, Thus, the type of 'special relationship' that makes a constitutional claim viable involves state custody or control."

Doe v. Claiborne County, Tenn., 103 F.3d at 510.

In Dorothy J. v. Little Rock School Dist., 7 F.3d 729 (8th Cir. 1993), the court, in examining a claim made by a student against a school for actions of another student, perhaps made it clearer. In Dorothy J., the court agreed with the District Court hold that the surroundings at the high school were not "'sufficiently analogous to a prison or prison-like environment to impose on the state an affirmative duty to protect [the victim] from [the offending student].'" Id. at 732 (quoting Dorothy J. v. Little Rock School Dist., 794 F. Supp. 1405, 1416). The court reasoned that public school attendance also did "not render a child's guardians unable to care for the child's basic needs." Dorothy J., 7 F.3d 732. The court also looked at whether the state had placed the victim in danger. Id. at 733.

When looking at the state-created-danger exception, if "'the state affirmatively places a particular individual in a position of danger the individual would not otherwise have been in,'" the Due Process Claus is implicated. Id. (Quoting Wells v. Walker, 852 F.2d 368, 370 (8th Cir. 1988) cert. denied, 489 U.S. 1012, 109 S.Ct. 1121). However, the fact that the offender was known to have had prior sexually violent behavior is not sufficient. The court held that to be liable "the state must be more directly implicated than it was here in the events causing victim's injury.'" Dorothy J., 7 F.3d 733 (quoting Dorothy J., 794 F. Supp. at 1421 (citing Martinez v. California, 444 U.S. 277, 100 S.Ct. 553(1980))). The court held the assault from the student who

had been in the facility for two years was "too remote a consequence" and that failure to prevent an assault was "the kind of 'traditional tort law' claim that the Supreme Court has refused to translate into a due process deprivation." Dorothy J., 7 F.3d 733 (citing Collins v. City of Harker Heights, Tex., 503 U.S. 115, 112 S.Ct. 1061, 1070(1992)). The court noted "[i]n most every circuit court decision imposing [liability] because the State affirmatively created or enhanced a danger, 'the immediate threat of harm has a limited range and duration,' unlike the indefinite risk created," when the offender is allowed to participate in the same program as the victim. Dorothy J., 7 F.3d 733, fn. 4 (citing Reed v. Gardner, 986 F.2d 1122, 1127 (7th Cir. 1993)). The court in Dorothy J. provided an excellent illustration of this immediacy requirement for the state-created danger doctrine when it addressed an allegation plaintiff brought up for the first time on appeal that an employee of one of the state agencies suspected the offender had assaulted the victim the day before and then put the two together, unsupervised, to confirm his suspicions the next day. Dorothy J., 7 F.3d 734. The court noted the significance of the allegation was obvious at the expense of a victim. Id. In the instant case, Stewart was not known to be an assailant, nor was any test devised to ascertain his tendencies.

Plaintiffs cite May v. Franklin County Bd. Of Commissioners, 2003 WL 1134499 (6th Cir. (Ohio) March 12, 2003) as being supportive of their position with regard to the state-created danger doctrine.[1] (Plaintiffs' Memo., p. 15) In May, the plaintiff's decedent was a victim of domestic abuse and had been restrained at the time police officers responded to a 9-1-1 call. Id. at 2-3. The officers knocked on the door, looked into the window and did not see anything. Id. After not seeing anything the officers left. Id. at 3. Unfortunately, the plaintiff's decedent was

---

[1] May is a case not recommended for full text publication and has not been published. Sixth Circuit Rule 28(g) advises the citation of unpublished decisions is disfavored unless used for establishing law of the case, estoppel or res judicata. None of these exceptions is applicable here. Rule 28(g) also restricts the use of unpublished cases for precedential value to a circumstance in which there is no other published opinion that would serve as well.

5

found murdered the next day. Id. Plaintiff claimed the assailant was emboldened by the actions of the officers. Id. at 4. Under these facts, the immediacy requirement was met. As the facts in the instant case are more aligned with Dorothy J., the court should disregard May pursuant to the Sixth Circuit's Rule 28(g).

Plaintiffs attempt to bootstrap the line of reasoning in May to avoid summary judgment by citing Robinson v. Township of Redford, 2002 WL 31398974 (6th Cir. Mich. Oct. 17, 2002) for the proposition that determining whether there is state action or inaction is a factually sensitive inquiry.[2] (Plaintiffs' Memo.. P. 15). However, in Robinson, the District court had ruled on a motion to dismiss, not a motion for summary judgment so it only had the pleadings to review. Id. at 2. In Robinson, the court discussed the concept of notice pleading, that a complaint need only give the defendant fair notice of the claim, id. at 3 (citations omitted), holding it could not determine whether an act or omission was implicated from the pleadings. Id. at 4. There is no scarcity of facts in the instant case, and plaintiffs still cannot get around the immediacy requirement.

Since the failures to act of the type alleged by plaintiffs, i.e. failure to investigate, failure to screen, failure to advise explorers of procedures for reporting abuse, (Plaintiffs' Memo., p. 17), have no immediacy of harm, these alleged failures to act must all be considered under Monell v. Department of Soc. Servs., 436 U.S. 658 (1978), to "avoid a defacto respondeat superior liability explicitly prohibited by Monell." Doe v. Claiborne County, Tenn., 103 F.3d at 508. As in Doe v. Claiborne County, Tenn., plaintiffs are alleging inaction or a failure to act. (Plaintiffs' Memo., p. 21) The court in Doe v. Claiborne County, Tenn., held the plaintiff alleging inaction must establish:

(1) the existence of a clear and persistent pattern of sexual abuse by school

---

[2] Robinson is also a case not recommended for full text publication and has not been published subject to the Sixth Circuit's Rule 28(g).

employees;
(2) notice or constructive notice on the part of the School Board;
(3) the School Board's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to any official policy of inaction; and
(4) that the School Board's custom was the 'moving force' or direct causal link in the constitutional deprivation.

Id.

The court clarified what was required to meet the third prong by stating "[t]he evidence must show that the need to act is <u>so obvious</u> that the School Board's 'conscious' decision not to act can be said to amount to a 'policy' of deliberate indifference to Doe's constitutional rights." Id. (citing <u>City of Canton v. Harris</u>, 489 U.S. 378, 389, 109 S.Ct. 1197, 1205 (1989))(emphasis added). The court ruled "'[d]eliberate indifference' in this context does not mean a collection of sloppy, or even reckless, oversights; it means evidence showing an obvious, deliberate indifference to sexual abuse.'" <u>Doe v. Claiborne County, Tenn.</u>, 103 F.3d at 508. In ruling the plaintiff had not shown that a custom or policy of inaction was responsible for the Board's inaction, the court noted the Board did not consciously fail to act when presented with egregious and obviously unconstitutional conduct. The court drew "an analytical distinction between being deliberately indifferent as to one particuar incident, and having a "policy" of always being deliberately indifferent to unconstitutional actions." Id.

In <u>McClelland v. Facteau</u>, 610 F.2d 693, 696-697 (10th Cir. 1979)(citations omitted), the court in determining whether supervisors could be held liable for a failure to train held that there must be an affirmative link which means participation in or acquiescence to continuing unconstitutional conduct after notice of the prior misbehavior. In <u>Turpin v. Mailet</u>, 619 F.2d 196, 201 (2nd Cir. 1980)(citations omitted) the court held

> "where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts."

7

The Supreme Court held that in such cases where the claim was one of failure to train, the municipality could not be held liable unless the failure amounted to deliberate indifference. City of Canton, Ohio v. Harris, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204 (1989). In Hubbard v. City of Middletown, 782 F. Supp. 1573, 1578 (S.D. Ohio 1990)(citations and internal quotations omitted), this Court held for a city to be liable, "[u]nder § 1983 a custom must be so permanent and well settled as to constitute a custom or usage with force of law. Further, the custom must have the acquiescence of a policymaker."

The court in Collins v. City of Harker Heights, Tex., 501, U.S. 115, 112 S.Ct. 1061 (1992), in a case involving a claim by the survivors of an sanitation employee who died of asphyxia after entering a manhole to unstop a sewer line, held the municipality could not be found to have deprived the worker of his liberty when it made and he voluntarily accepted employment. The court explained it was

> "not persuaded that the city's alleged failure to train its employees, or to warn them about known risks of harm, was an omission that can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense. Petitioner's claim is analogous to a fairly typical state-law tort claim: The city breached its duty of care to her husband by failing to provide a safe work environment....
> Our refusal to characterize the city's alleged omission in this case as arbitrary in a constitutional sense rests on the presumption that the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political and economic forces. Cf. Walker v. Rowe, 791 F.2d 507, 510 (CA7 1986). Decisions concerning the allocation of resources to individual programs, such as sewer maintainence, and to particular aspects of those programs, such as the training and compensation of employees, involve a host of policy choices that must be made by locally elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country. The Due Process Clause 'is not a guarantee against incorrect or ill-advised personnel decisions.' Bishop v. Wood, 426 U.S. at 350, 96 S.Ct. at 2080. Nor does it guarantee municipal employees a work place that is free of unreasonable risks of harm."

Collins, 501, U.S. 115, 128-129, 112 S.Ct. 1061, 1070.

In the instant case, Deputy Stewart had been extensively trained. (Jones Depo., p. 37, Exhibit 10) There was also extensive screening as part of the hiring process of the BCSO. (Jones

Depo., pp. 14-19) There was an official policy of not tolerating sexual harassment and abuse. (Jones Depo., pp. 10-12, Exhibits 8 & 9) There was no notice on the part of high level supervisors at the BCSO of any prior sexual abuse by Stewart. (Dwyer Depo., pp. 45-46; Jones Depo., pp. 54-56) Almost immediately after evidence of abuse came to the attention of the BCSO, Stewart was suspended pending an investigation. (Dwyer Depo., p. 37; Jones Depo., p. 54)

### III.  STATE LAW CLAIMS

#### A.  Immunity

Plaintiffs allege defendant did not go far enough in alleging its immunity defense. (Plaintiffs' Memo., p. 22) Ohio's governmental immunity scheme is one that provides for definitions regarding the scheme in R.C. § 2744.01, provides immunity for political subdivisions in R.C. § 2744.02(A)(1), then provides exceptions to that immunity in R.C. § 2744(B). Finally, additional immunities and defenses are provided in R.C. § 2744.03.

As plaintiffs concede, the BCSO is a political subdivision, and the threshold requirement for governmental immunity is met. (Plaintiffs' Memo., p. 22) Next, it must be determined whether the actions attributed to the government were governmental functions or proprietary functions. Governmental functions include "[t]he provision or nonprovision of police, fire, emergency medical, ambulance, and rescue services or protection." R.C. 2744.01(C)(2)(a). Clearly, as anything connected with the BCSO would fall into either the provision or nonprovision of police services or protection, all the alleged actions relevant to this matter were governmental functions. Plaintiffs do not allege the activities of Deputy Stewart with respect to the Explorers should be classified as proprietary functions and analyze the situation with the assumption that the activities were governmental functions. (Plaintiffs' Memo., p. 22)

Revised Code § 2744.02(A)(1) provides immunity from damages "in civil actions for injury, death, or loss to person or property allegedly caused by an act or omission of the political

subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." Revised Code § 2744.02(B) provides for exceptions to the immunity in § 2744.02(A)(1). Exceptions to immunity include liability for injury from negligent operation of motor vehicles, R.C. §2744.02(B)(1), liability for injury from negligent performance of acts by their employees with respect to proprietary functions, R.C. § 2744.02(B)(2), liability for injury from failure to keep roads in repair and free from nuisance, R.C. § 2744.02(B)(3), liability for injury from negligence of employees which "occurs within or on the grounds of buildings that are used in connection with the performance of a governmental function," R.C. 2744.02(B)(4), and where expressly imposed by statute, R.C. § 2744.02(5). Plaintiffs allege defendant's conduct falls "squarely" into R.C. § 2744.02(B)(4) citing <u>Hubbard v. Canton City School Bd. of Educ.</u>, (2002) 97 Ohio St.3d 451, 780 N.E.2d 543. (Plaintiffs' Memo., p. 22)

The facts in <u>Hubbard</u> are easily factually distiguishable from those in the instant case. In <u>Hubbard</u>, the court held R.C. § 2744.02(B)(4) provides for an exception to immunity only for <u>injuries</u> occurring on governmental property and buildings as the result of negligence of a governmental employee. <u>Hubbard</u>, 97 Ohio St.3d at 453 and syllabus. Specifically, the court in Hubbard held:

> "the exception to political-subdivision immunity in R.C. 2744.02(B)(2) applies to all cases <u>where an injury</u> resulting from the negligence of an employee of a political subdivision <u>occurs</u> within or on the grounds of buildings that are used in connection with the performance of a governmental function."

<u>Hubbard</u>, 97 Ohio St.3d at 454-455 (emphasis added). Thus, in <u>Hubbard</u>, the negligence occurred "within or on the grounds of buildings" as required by R.C. 2744.02(B)(4). However, in the instant case, plaintiffs allege the incidents occurred in a patrol car during ride alongs and in a tent at camp. (Plaintiffs' Memo., p. 8) Realizing their case does not fit within the confines of R.C. § 2744.02(B)(4), plaintiffs attempt to argue that it is where the decision making process is–within government walls--that should be determinative, not where the injury occurred..

(Plaintiffs' Memo., p. 23) However, plaintiffs have no evidentiary support as to where the decision making took place in the instant case. As decision making could take place in a location separate and apart from a governmental property or building, such a test could lead to inconsistent results in factually similar cases. In fact, if the narrowly drawn exception to liability is to be construed as broadly as plaintiffs contend, the exception swallows the immunity.

Shifting their theory again, plaintiffs allege it was the failure to supervise and instruct which was the negligence which should pierce the veil of immunity. (Plaintiffs' Memo., p. 24) Again, plaintiffs fail to allege where this supervision took place knowing it would have not have taken place within or on grounds of buildings used in connection with governmental functions. To have actually supervised Stewart where the abuse took place, someone would have had to accompany Stewart on ride-alongs and been in the tent. Neither of these locations fit within he statute to establish an exception to immunity. Cognizant of these problems, plaintiffs then attempt to blur the clear provisions of the statute requiring the injury occur "within or on the grounds of buildings" by alleging the molestation in the patrol car occurred "within the confines of government property" and arguing the abuse in a tent qualifies despite the lack of a building with which the ground the tent was on could be associated. (Plaintiffs' Memo., p. 24) The Safety Camp was actually put on by the American Red Cross and a Hamilton fire investigator at Camp Campell Guard. (D. Berter Depo., p. 15) Given the fact that plaintiffs' allegations do not fit within any of the immunity exceptions, the BCSO is entitled to summary judgment as a matter of law on plaintiffs' state law claims.

While analysis under the third part of the immunity scheme is unnecessary if no exception to immunity applies, assuming, for the sake of argument, the allegations did fall within the exception of R.C. § 2744.02(B)(4), the BCSO would still be entitled to immunity unless the judgment or discretion it exercised in determining how to use materials, personnel facilities, and other resources was in bad faith, or in a wanton or reckless manner. R.C. § 2744.03(A)(5). In

11

Fabrey v. McDonald Police Department (1994), 70 Ohio St.3d 351, 356, 639 N.E.2d 31, the court held that the standard for showing wanton misconduct is high. The court noted it had previously held "wanton misconduct was the failure to exercise any care whatsoever." Id. (citing Hawkins v. Ivy (1977), 50 Ohio St.2d 114, 363 N.E.2d 367, syllabus). The court noted "'mere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor.' Such perversity must be under such conditions that the actor must be conscious that his conduct will in all probability result in injury." Fabrey, 70 Ohio St.3d at 356 (quoting Roszman v. Sammett (1971), 26 Ohio St.2d 94, 96-97, 269 N.E.2d 420, 422); see Matkovich v. Penn Central Transp. Co. (1982), 69 Ohio St.2d 210, 212, 431 N.E.2d 652 ("Hawkins created a two-part test for wanton misconduct. First, there is a failure to exercise any care whatsoever by those who owe a duty of care . . . Secondly this failure occurs under circumstances in which there is great probability that harm will result from the lack of care.").

    While plaintiffs cite Fabrey for the principle that the issue of whether behavior was wanton or reckless is one for the jury, (Plaintiffs' Memo., p. 25), the court in Fabrey affirmed the grant of summary judgment in favor of the McDonald police chief, Tyree, on the issue. Fabrey, 70 Ohio St.3d at 356. In Fabrey, the plaintiff was injured during a fire set by a jail inmate. Id. at 352. Fabrey alleged his injuries were the result of Tyree not complying with minimum jail standards. Id. at 356. However, the court held the failure to maintain the safety devices required by the minimum jail standards was mere negligence. Id. at 357.

    Plaintiffs also cite Cater v. Cleveland (1998), 83 Ohio St.3d 24, 697 N.E.2d 610, in support of their position that questions of whether behavior is wanton or reckless is for the jury. However, Cater involved a near drowning incident which occurred at a city pool frequented by one hundred children unaccompanied by adults that was complicated by the fact the city had never trained its lifeguards on how to use the phone system or the use of 9-1-1 and had no policy

regarding 9-1-1 resulting in a thirty minute delay in treatment of the victim. Id. at 32. Cater is distinguishable merely upon the physical environment. Swimming can be dangerous under ideal conditions such as a sudden attack of cramps. Even people who are good swimmers can drown. A deprivation of oxygen can cause death or brain damage in minutes. If the environment in such a situation increases the probability of harm, the threshold to find behavior wanton or reckless is lowered making it easier for reasonable minds to differ as to the conduct. In the instant case, the environment was objectively benign making this case appropriate for summary judgment. As the BCSO is entitled to immunity on plaintiffs assault and battery claims, summary judgment should be granted on these claims.

### B. Sexual Harassment Under R.C. 4112.02

Ohio's sexual discrimination statute, R.C. § 4112.02, is excepted from the statutory immunity scheme. See R.C. § 2744.09 and Brewer v. Cleveland Bd. of Edn. (1997), 122 Ohio App. 3d 378, 383, 701 N.E.2d 1028. Additionally, federal cases regarding sexual discrimination interpreting Title VII are applicable to cases involving R.C. § 4112.02. Plumbers & Steamfitters Commt. v. Ohio Civil Rights Comm. (1981), 66 Ohio St.2d 192, 196, 421 N.E.2d 128. In Garcia v. ANR Freight System, Inc., 942 F.Supp. 351, 355-356 (N.D.Ohio 1996)(citations omitted)(emphasis added), the court held that to succeed on a gender-based hostile work environment claim, a plaintiff must prove:

> "(1) the employee was a member of a protected class; (2) the employee was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (3) the harassment complained of was based upon sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive work environment; and (5) the existence of respondeat superior."

While Garcia was issued prior to the Supreme Court's decision in Onacle v. Sundowner Offshore Services, Inc., 523 U.S. 75, 79-80, 118 S.Ct. 998, 1002 (1998), allowing same sex sexual harassment, Onacle would only modify the above test by negating the first element–a

13

demonstration that the plaintiff was a member of the protected class. Aside from the recent development of Onacle, hostile work environment sexual harassment under Title VII and R.C. § 4112.02 are identical including evaluation for purposes of summary judgment. Garcia, 942 F.Supp. at 358, fn. 7(citing Delaney v. Skyline Lodge, Inc. (1994), 95 Ohio App.3d 264, 642 N.E.2d 395)

It will not be argued now as to the motion for summary judgment that the actions of Deputy Stewart do not qualify as unwelcome physical conduct of a sexual nature under the second prong of Garcia. Defendant is not conceding the actions of Deputy Stewart were unwelcome. Defendant is merely choosing not to address this element of Garcia at this time. Likewise, it will not be contested for purposes of the motion only that Stewart's actions were based upon sex, the third prong of the Garcia test. However, for purposes of the present motion, Defendant does contest three elements of the Garcia test, reserving all others for later determination: the fourth prong (work interference and hostile work environment), the fifth prong (respondeat superior), and the implicit requirement in prongs 1, 2, 4, and 5 that the plaintiff must be an employee. Each of these issues will be analyzed in turn below.

In Garcia, the court, speaking to the fourth prong, ruled a plaintiff must establish the workplace was "'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" 942 F.Supp. at 355-356 (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 114 S.Ct. 367 (1993)). The court in Garcia cited factors to be examined to determine whether an environment is hostile or abusive: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." 942 F.Supp. at 356 (quoting Harris, 510 U.S. at 23, 114 S.Ct. at 369).

Plaintiffs cite only a few instances of conduct over a period of several years in the

Explorers program some of which occurred while Stewart was a deputy and some of which did not. (McCroskey Depo., pp. 26-27, 39-41, 74, 84; Andrews Depo., p. 49) In Garcia, the harassment consisted of at least three acts towards one employee during her five day training period including "grabbing the back of plaintiff's head and guiding it toward his lap, asking to spend the night in plaintiff's motel room and brushing his hand against plaintiff's breast." 942 F.Supp. at 354. The court held plaintiff's work environment was not hostile or abusive. Id. at 356. Plaintiffs in the instant case were subjected to less frequent conduct. Thus, the conduct was infrequent. Garcia, like Plaintiffs in the instant case, was propositioned. However, the court held a single act of propositioning was not humiliating or intimidating. Id. Plaintiffs testified in their depositions that Stewart never threatened them with physical violence. (McCroskey Depo., pp. 127-129; Andrews Depo., p. 65) McCroskey even went on to intern at the BCSO in the Summer of 2000 as an employee. (McCroskey Depo., p. 164) McCroskey indicated he did not believe there were any hard feelings as a result of the investigation of Deputy Stewart. (McCroskey Depo., pp. 104-105) While an explorer, Andrews felt he could handle the situation. (Andrews Depo., p. 90) Subsequent to Stewart's suspension, firing and conviction, Andrews could not cite to any job related damages as a result of Stewart's conduct. (Andrews Depo., p. 135) Plaintiffs have failed to demonstrate how Stewart's actions unreasonably interfered with their "work performance" under the first part of the fourth prong of the test in Garcia.

As to the fifth prong of Garcia, plaintiffs cite Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S.Ct. 2275, 2293 (1998), as establishing vicarious liability upon an employer when a supervisor creates an actionable hostile environment. (Plaintiffs' Memo., p. 27) However, Faragher provides defenses

> "[w]hen no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages . . . [comprised] of two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexual harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective

15

opportunities provided by the employer or to avoid harm otherwise."

Id. No tangible "employment" action was taken against plaintiffs with respect to their Explorer activities. (McCroskey Depo., pp. 164, 173-175, 181) Hence, the Faragher defense is available to the BCSO.

This negligence type standard was also discussed in Kerans v. Porter Paint Co. (1991), 61 Ohio St.3d 486, 492-493, 575 N.E.2d 428, where the court determined that a plaintiff's sexual harassment claim should not have been dismissed on summary judgment. In Kerans, plaintiff had alleged she had been sexually molested five separate times on one day, 61 Ohio St.3d at 487, when the company had knowledge of eight prior incidents involving five different employees and did nothing to correct the employee's behavior and actually condoned it, 61 Ohio St.3d at 493-494. As part of its reasoning the court explained

> "where an employer knows or has reason to know that one of his employees is sexual harassing other employees, he may not sit idly by and do nothing. The appropriate response, which may range in severity from a verbal warning, to a transfer, to a temporary suspension, to a firing, will depend on the facts of the particular case, including the frequency and severity of the employee's actions."

Id. at 493. The Garcia court even distinguished Kerans v. Porter Paint Co. (1991), 61 Ohio St.3d 486, 575 N.E.2d 428, holding "general unreported internal sentiment and second-hand, indirect external reports [were] too diffuse, attenuated, and remote to convey knowledge sufficient to put [the employer] on notice of [their employee's] alleged harassing propensities. 942 F.Supp. at 358. Thus, some direct actual reported knowledge is required to infer the employer should have known about an employee's propensity for sexual harassment.

In the instant case, the BCSO had a sexual discrimination policy which even applied to non-employees. (Jones Depo., pp. 10-13, Exhibits 8 & 9) The policy provided for a complaint mechanism. (Jones Depo., pp. 10-12, Exhibit 8 Section 1.4.2(d) and Exhibit 9–Rule 43, subsection D–each policy providing an assurance of bypass of a harassing supervisor in ¶ 3) While this policy may not have been communicated to Explorers as they were not employees,

16

they had meetings on a regular basis and could at any time raise issues with the advisor, Deputy Dan Berter, or other employees. (Jones Depo., p. 26; D. Berter Depo., p. 37) Explorers were even asked if they had anything to report about Stewart, but not one came forward, not even the plaintiffs. (McCroskey Depo., pp. 58-63, 88) Additionally, Stewart's actions were supervised both by the Post Advisor and through regular channels at the BCSO. (Jones Depo., pp. 27-28; D. Berter Depo., p. 28) These actions were reasonable. Furthermore, when the sexual harassing behavior was reported, prompt corrective action was taken–within days of learning of the conduct, the BCSO suspended then fired Stewart and brought criminal charges. (Dwyer Depo., pp. 34-36, Exhibits 6; D. Berter Depo., pp. 39-40)

Faragher and Kerans are easily distinguishable from the instant case. In Faragher, plaintiff was a lifeguard for the Marine Safety Section of the Parks and Recreation Department of the City of Boca Raton. 524 U.S. at 780, 118 S.Ct. at 2280. Her supervisors, also employees of the Marine Safety Section, 524 U.S. 781, 118 S.Ct. 2280, were never provided the City's policy against sexual harassment, 524 U.S. at 808, 118 S.Ct. at 2293. The court noted City officials also made no attempt to keep track of the conduct of the supervisors "as these were granted virtually unchecked authority over their subordinates." Id. (internal quotations omitted). Lastly, the City's policy did not provide "any assurance that the harassing supervisors could be bypassed in registering complaints." Id. In Kerans, Porter Paint knew of and condoned their employee's history of sexual molestation. 61 Ohio St.3d at 493-494. There is no similar evidence in the instant case to suggest the BCSO was aware of any prior incidents of sexual molestation by Stewart or anyone. (D. Berter Depo., p. 42) In contrast to Porter Paint, the BCSO took the most severe actions recommend by Kerans, suspension and firing, then went a step further and brought felony criminal charges against Stewart, all within days of learning of the incidents. (Dwyer Depo., pp. 34-36, Exhibits 6; D. Berter Depo., pp. 39-40)

As to the employment requirement in several of the prongs in Garcia, Plaintiffs allege

they were employees of the BCSO while explorers, but provide no evidence in support of their position. (Plaintiffs' Memo., p. 28) The Explorers were volunteers, not employees. (D. Berter Depo., pp. 22-24) Plaintiffs claim in their argument heading (Plaintiffs' Memo., p. 28, § III., C., 2., a.) that Kerans v. Porter Paint Co., supra, supports their position; however they do not cite to the Kerans decision in that section of their memorandum. (Plaintiffs' Memo., pp. 28-30, § III., C., 2., a.) While plaintiffs attempt to argue participation in the Explorers program was an apprentice "training program", (Plaintiffs' Memo., p. 28), Explorer Post Advisor Deputy Dan Berter testified explorers would not have any sort of hiring preference with the BCSO and could not say being an explorer was something favorable to have on a resume. (D. Berter Depo., p. 23)

In Armbruster v. Quinn, 711 F.2d 1332 (6th Cir. 1983), the court, in construing Title VII indicated broad interpretation should be given to the employer and employee provisions. Armbruster dealt with the jurisdictional issue of whether a wholly owned corporate employer was large enough to be covered by Title VII, whether its parent corporation should be considered the owner and whether certain "manufacturer representatives" should be considered employees for the purposes of jurisdiction. Id. The court noted that the "'burden of establishing jurisdiction is on the plaintiff.'" Id. at 1335 (quoting Welsh v. Gibbs, 631 F.2d 436 (6th Cir. 1980), cert. denied, 450 U.S. 981, 101 S.Ct. 1517). The court adopted an "economic realities" standard. Armbruster, 711 F.2d at 1340. The court noted when attempting to determine whether someone is an employee under Title VII, the term should be considered "in light of the mischief to be corrected". Id. (internal quotations omitted). The court then gave factors to guide the District Court in its review of the case upon remand:

> "[w]ithout being exhaustive, relevant evidence on the question could include hiring and termination processes and history of the manufacturer's representatives as well as evidence as to payment of these individuals, company paid benefits or advances. Likewise, evidence of advancement or the opportunity therefore by any manufacturer's representative to a position at [the parent company] or [corporate

employer] would be <u>relevant</u> as would evidence of whether the other products sold by the manufacturer's representatives were those of [the parent company or its parents]."

<u>Id.</u> at 1342, fn. 9 (emphasis added). Contrary to plaintiffs' assertion (Plaintiffs' Memo., p. 29), as noted above, the court did not state that economic benefits in the form of opportunities for advancement alone is determinative as to the creation of an employment relationship.

In analyzing the facts of the current case under the factors provided in <u>Armbruster</u>, it is clear Explorers were not employees of the BCSO. Andrews even admitted he was not an employee. (Andrews Depo., p. 76) There was no hiring or termination process relative to Explorers by the BCSO. Explorers came and went as they chose. There was also no payment, paid benefits or advances from the BCSO to explorers. (D. Berter Depo., pp. 20-22) While Explorers could apply for positions with the BCSO, being an explorer was not necessarily favorable to have on a resume. (D. Berter Depo., p. 23) Thus, plaintiffs have not shown through "economic realities" that Explorers were employees. The Explorers is not the same as a labor union or trade guild where persons actually learn a trade while earning money and advances through the trade in a systematic process.

## IV. CONCLUSION

As plaintiffs have failed to establish any genuine issues of material fact with regard to whether there was any policy or custom on the part of the BCSO condoning sexual abuse or harassment, completely failed to establish their allegations fall within any exception to immunity provided under R.C. § 2744.02 and failed on their burden of showing they could be considered employees or were subjected to a hostile work environment for which the BCSO can be held liable, defendant's motion for summary judgment should be granted.

Respectfully Submitted,

s/ Jack C. McGowan
Jack C. McGowan Bar Number:0005619
McGOWAN & JACOBS, LLC
Attorney for Defendant
246 High Street
Hamilton, Ohio 45011
(513)844-2000/Fax(513)868-1190
E-mail: JCM@jcmcgowan.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of January, 2004, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Marc D. Mezibov, Esq. at 920 Fourth & Race Tower, 105 W. Fourth Street, Cincinnati, Ohio 45202.

s/ Jack C. McGowan
Jack C. McGowan Bar Number:0005619
McGOWAN & JACOBS, LLC
Attorney for Defendant
246 High Street
Hamilton, Ohio 45011
(513)844-2000/Fax(513)868-1190
E-mail: JCM@jcmcgowan.com